1  SARINA SALUJA, SBN 253781
   E-Mail:  ssaluja@fisherphillips.com
2  FISHER & PHILLIPS LLP
3  444 South Flower Street, Suite 1500
   Los Angeles, California 90071
4  Telephone: (213) 330-4500
5  Facsimile: (213) 330-4501

6  Attorneys for Plaintiff Fidelity Brokerage Services LLC

7

8              UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

10

| | |
|---|---|
| FIDELITY BROKERAGE SERVICES LLC, | **CASE NO.** |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **(1) MISAPPROPRIATION OF TRADE SECRETS – CUTSA** |
| CAROL YORK and CYPRESS WEALTH SERVICES, LLC, | **(2) MISAPPROPRIATION OF TRADE SECRETS – DEFEND TRADE SECRETS ACT** |
| Defendants. | **(3) BREACH OF CONTRACT** |
| | **(4) TORTIOUS INTERFERENCE WITH CONTRACT** |
| | **(5) UNJUST ENRICHMENT** |
| | **(6) UNFAIR COMPETITION** |
| | **(7) INJUNCTIVE RELIEF** |

20

21       Plaintiff Fidelity Brokerage Services LLC ("Fidelity") seeks injunctive relief

22  against Defendants, its former employee Carol York and her new employer Cypress

23  Wealth    Services,    LLC    ("Cypress")    (collectively    "Defendants")    for:

24  (1) misappropriation of trade secrets under the California Uniform Trade Secrets Act;

25  (2) misappropriation of trade secrets under federal law; (3) breach of contract;

26  (4) tortious interference with contract; (5) unjust enrichment; (6) unfair competition;

27  and (7)  injunctive relief. Fidelity further seeks an Order compelling arbitration before

28  a Financial Industry Regulatory Authority ("FINRA") Arbitration Panel, pursuant to

Rules 13200 and 13804 of the FINRA Code of Arbitration Procedure. The Defendants are presently misusing Fidelity's confidential and trade secret customer information, which York obtained knowledge of and access to as a result of her employment with Fidelity, for the improper purpose of soliciting Fidelity customers to transfer their Fidelity accounts to Defendants. York's conduct further breaches her Employee Agreement with Fidelity, Cypress has tortiously interfered with that agreement and both Defendants have been unjustly enriched through their misconduct.

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Fidelity Brokerage Services LLC is a Delaware Limited Liability Company, whose sole member is Fidelity Global Brokerage Group, Inc., a corporation organized and existing under the laws of Massachusetts with its principal place of business located in Boston, Massachusetts. Fidelity is a member firm of FINRA.

2.      Defendant York is Financial Consultant in Fidelity's Palm Desert, California office. She is an adult citizen and resident of the state of California. York was registered with FINRA during her employment with Fidelity.

3.      Defendant Cypress is a limited liability company organized under the State of California with its principal place of business in Palm Desert, California.

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this matter involves a cause of action arising under federal law: the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq. See* 18 U.S.C. § 1836(c) ("The district courts of the United States shall have original jurisdiction of civil actions brought under this section."). This Court has supplemental jurisdiction over all state claims brought in this action pursuant to 28 U.S.C. § 1367 because they are so related to the DTSA claim for which this Court has original jurisdiction that they form part of the same controversy. Notably, York used Fidelity's confidential and trade secret customer information to solicit Fidelity's customers.

5.      Cypress regularly and systematically conducts business in the State of California by soliciting and providing financial advisory services to clients located in

California.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) since a substantial part of the events giving rise to the claims occurred in this District.

## NATURE OF THE CASE

7.     Through this action, Fidelity seeks injunctive and other relief to stop the Defendants' continuing misappropriation and misuse of Fidelity's trade secrets and breach of her contractual obligations.

8.     York worked in Fidelity's retail brokerage operations as a Financial Consultant in Fidelity's Palm Desert, California office.   In connection with her employment, York was assigned customers to service on behalf of Fidelity.

9.     Since resigning, effective immediately, and joining Cypress, York has used Fidelity's confidential and trade secret customer information that she had access to by virtue of her employment with Fidelity, to unlawfully solicit Fidelity customers to transfer their business to Cypress, a direct competitor.

10.     Fidelity seeks a Temporary Restraining Order and Preliminary Injunction requiring the Defendants to return to Fidelity any and all records and/or documents in any form, received or removed from Fidelity by York, containing information pertaining to customers she served or whose names became known to her while in the employ of Fidelity, including, but not limited to, any customer list or documents replicated or "recreated" by York from memory or otherwise, including by using her memory to look up customer names in public sources.  Fidelity also seeks an order prohibiting further solicitation of Fidelity clients by the York, or anyone acting on her behalf, including Cypress.  This injunctive relief is necessary to end the Defendants' unlawful activities, which include misuse of Fidelity's trade secrets and unfair competition.

11.     Fidelity and York are obligated to arbitrate the merits of their dispute consistent with the arbitration rules and regulations of the Financial Industry Regulatory Authority ("FINRA") pursuant to FINRA Rule 13200.  Accordingly, concurrently with

the filing of its Motion for a Temporary Restraining Order and Preliminary Injunction, Fidelity also is filing a Statement of Claim with FINRA Dispute Resolution, Inc. seeking binding arbitration of this dispute pursuant to Rule 13804(a)(2).

12.     Although the merits of this case against York will be resolved in arbitration before FINRA, pursuant to FINRA Rule 13804, Fidelity is required to seek and obtain injunctive relief in a court of competent jurisdiction before an expedited FINRA arbitration is permitted to proceed.  Once an injunction is issued by this Court, an expedited arbitration will be scheduled with FINRA within fifteen (15) days of the entry of the injunction.  If no injunction is issued, however, this case cannot be heard by FINRA on an expedited basis and, instead, will be assigned to a standard-track arbitration, which would likely delay a hearing on the merits for a year or more. Temporary injunctive relief, therefore, is required to preserve the *status quo* until the merits of this case can be adjudicated by FINRA.

## **FACTS COMMON TO ALL COUNTS**

### **Fidelity's Unique Customer Development Practices**

13.     Fidelity and its affiliates provide a variety of financial services—such as retirement services, investment planning, wealth management, securities execution and clearing, life insurance services, and equity services—to Fidelity customers, with whom Fidelity typically enjoys significant, long-term relationships.  Fidelity offers individual investors a broad assortment of trading and cash management features including buying and selling stocks, bonds, options and thousands of mutual funds from Fidelity and other well-known fund companies.

14.     Fidelity is unique in the retail brokerage field because Fidelity does not have its Financial Consultants, such as York, make "cold calls" to persons who have no relationship with Fidelity, or who were not referred to Fidelity.

15.     Instead, Fidelity assigned the vast majority of clients to Financial Consultants to service.

16.     With regard to the remaining clients, Fidelity requires its Financial Consultants to develop service relationships based upon leads that Fidelity provides.

17.     Fidelity provides leads to its Financial Consultants from two primary sources.

18.     First, Fidelity forwards information to its representatives from prospective customers who initiate contact with Fidelity either by telephone, over the internet, or in person.

19.     Fidelity and its affiliates devote tens of millions of dollars per year toward attracting customers to Fidelity's various businesses in a variety of means.  Fidelity arranges to publish and broadcast national and local advertisements which invite potential customers to contact Fidelity; Fidelity maintains an interactive internet page that allows interested persons to establish relationships with Fidelity; Fidelity maintains multiple call centers that prospective customers can use to initiate contact with Fidelity; and Fidelity maintains prominent retail locations which prospective customers can visit.

20.     A large portion of Fidelity's business is derived from this initial customer contact that is generated by significant investments of time, labor, and capital by Fidelity.

21.     Second, Fidelity forwards information to its representatives regarding customers, with whom Fidelity already has a relationship, when those customers experience "triggering events," such as Fidelity 401(k) distributable events, which may lead to interest in Fidelity's retail financial services.

22.     In addition, representatives may be assigned to service customers previously serviced by other representatives in certain circumstances, such as if the former representative moves, leaves Fidelity, or is promoted to another position.

23.     A significant portion of Fidelity's business is derived from servicing the needs of Fidelity's existing customers.

24.     Fidelity's lead-based approach to supporting its Financial Consultants distinguishes Fidelity from other full-service brokerages, where individual brokers, rather than the firm, are responsible for establishing customer relationships.

25.     Fidelity's success in its lead-based approach is based on the typically long-standing relationships it enjoys with its customers.

### Fidelity's Trade Secret Customer Information

26.     Fidelity's success with its unique lead-based approach to supporting Financial Consultants, such as York, is directly tied to Fidelity's trade secret customer information, which is among Fidelity's most important assets.

27.     Fidelity's trade secret customer data includes not only the names and contact information of Fidelity customers, but also includes financial information relating to those customers, such as customer financial statements, investment goals, investment history, assets, income, and net worth.

28.     Although certain portions of such information might be publicly available — such as an individual's name or published home telephone numbers — only a limited number of Fidelity employees know who among the general public are Fidelity customers who have demonstrated a specific need and desire for investment services and are willing to pay for those services.

29.     Fidelity developed its customer base through a significant investment of time, labor, and capital, as described above.

30.     Fidelity maintains its customer data in confidence, both to preserve Fidelity's competitive advantage in its customer base and to meet customer expectations that Fidelity will maintain sensitive, personally identifiable information (including their identity as a customer, contact information and financial information) in confidence.

31.     Fidelity derives substantial economic value from preserving its customer data as a trade secret.

32.     Although individual customers are periodically subject to random solicitations from Fidelity competitors, no competitor can effectively target a set of Fidelity customers and address their needs without access to or specific knowledge of Fidelity's trade secret customer data.  In this way, maintaining the confidentiality of Fidelity's trade secret customer data provides Fidelity with a significant competitive advantage over its competitors.

**Fidelity's Efforts to Preserve the Confidentiality of Its Customer Data**

33.     Fidelity vigilantly preserves its trade secret customer data so that it does not become available to competitors who could use the data to divert customers, without the investment of time, labor, and capital that Fidelity made to compile the information. Fidelity does not provide its trade secret customer data to competitors.

34.     Fidelity maintains its trade secret customer data on password-protected computers, and only employees whose jobs require access to the customer data are provided with such access.

35.     Fidelity also maintains and advises its employees of a Global Policy on Information Protection that is displayed on Fidelity's intranet.  A true and correct copy of Fidelity's Global Policy on Information Protection is attached to the Affidavit of Stephen Jennings as Exhibit C, submitted with Fidelity's Ex Parte Application for a Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction. Fidelity periodically reminds its employees of this policy and provides employees with a Quick Reference Card ("QRC") explaining how to protect specific types of Fidelity confidential information.  Id. at Exhibit C of Jennings Affidavit.

36.     Fidelity also preserves trade secret customer data by requiring employees, including York, to sign Employee Agreements in which each employee agrees not to use or disclose Fidelity confidential information, including Fidelity customer information, outside of Fidelity.

37.     Fidelity records indicate that Defendant York executed Fidelity's Employee Agreement in connection with her initial hire on November 7, 2012.  A copy

of York's signed 2012 Agreement is attached to the Jennings Affidavit as <u>Exhibit A</u>. York again renewed her promises by executing the Employee Agreement on March 16, 2016, in connection with her promotion to become a Financial Consultant with Fidelity. A copy of York's signed 2016 Agreement is attached to the Jennings Affidavit as <u>Exhibit B</u>.

38.     In her Employee Agreements, York acknowledged the confidentiality of Fidelity's records, and defined "Confidential Information" to include Fidelity's customer lists and customer information. *Id.* at <u>Exhibits A-B</u> at ¶ 1.

39.     York promised to use Fidelity's Confidential Information and trade secrets only in the course of her employment with Fidelity and not to divulge Fidelity's trade secrets to third parties. *Id.*

40.     York promised that, upon termination of employment, she would "return all company property … including but not limited to Confidential Information." *Id.*

41.     York also promised that following termination of employment she would not use Fidelity's Confidential Information to solicit Fidelity's clients. *Id.*

42.     Finally, York further promised that for a period of one year following termination of her employment she would not "directly or indirectly … solicit in any manner or induce or attempt to induce any customer or prospective customer with whom Employee had personal contact or about whom Employee otherwise learned during the course of the Employee's employment with the Fidelity Companies." *Id.*

43.     York agreed that any violation of the Employee Agreement—including after her termination—would cause Fidelity irreparable damage and would entitle Fidelity to seek injunctive relief to protect its trade secret customer information. *Id.*

44.     As consideration for the Employee Agreements York executed, Fidelity hired her, compensated her throughout her employment, promoted her, provided her with introductory and continuing on-the-job training and education, and allowed her access to confidential customer information. In addition to assigning customers to York to service, Fidelity also provides Financial Consultants, including York, with the

resources to enable them to successfully service clients at Fidelity, including support services, market reporting services, research, sales assistance, access to and use of experts in asset management, tax, estate planning and insurance, and all other requirements necessary to best perform their job for Fidelity's customers.  Fidelity also registered York with the New York Stock Exchange and Financial Industry Regulatory Authority ("FINRA").

45.     Fidelity has been vigilant in protecting its customers' privacy because most Fidelity customers do not want, and have not authorized, Fidelity to share their contact or financial information outside of Fidelity.  Furthermore, Fidelity is required by federal law to prevent the disclosure to third-parties of nonpublic customer information, including customers' contact information and financial information.  *See* 15 U.S.C. § 6801, *et seq.*; 17 C.F.R. § 248.1, *et seq.*

**The Defendants Misappropriated Fidelity's Trade Secret Customer Information And Is Using It For Their Own Benefit**

46.     York resigned from Fidelity effective June 6, 2019, ostensibly to retire, and subsequently joined Defendant Cypress.

47.     Shortly after York's last day of employment, she was sent a letter from Fidelity's HR department reminding her of her post-employment obligations, including that she not use Fidelity's confidential information or solicit customers pursuant to her Employment Agreement, and enclosing a copy of her Employment Agreement.  A copy of the June 15, 2019 letter is attached to the Jennings Affidavit as Exhibit D.

48.     Despite notice of her contractual and other legal obligations, a customer has reported that York called him on September 28, 2019, after York retired from Fidelity.  She called the customer on his personal cell phone number, which he indicated to Fidelity is not publicly listed.  The customer notified Fidelity of this because he is concerned that she has and is using his personal information at her new firm.  *See* Declaration of Kristopher Henkel

49. Importantly, during the call, York also directly solicited the customer to move his business to her new firm. She told him that she now worked for TD Ameritrade and wanted him to transfer his business to her new firm. *See* Declaration of Kristopher Henkel.

50. Fidelity alleges, upon information and belief, that Defendant Cypress encouraged, aided and assisted York in soliciting Fidelity clients.

### The Threat of Immediate and Irreparable Harm
### Fidelity Faces from the Defendants' Conduct

51. The Defendants' conduct has irreparably harmed Fidelity and will continue to irreparably harm Fidelity if not stopped immediately. Indeed, the Defendants' conduct has and will continue to irreparably harm Fidelity's relationships with its customers, such as by losing goodwill, losing future business or referrals, as well as losing trust and confidence in securing inherently-private information, which cannot be calculated with precision and cannot be adequately compensated.

52. Fidelity's customer information, including the identity of Fidelity customers, is also required to be kept confidential under the Gramm-Leach-Bliley Act and its implementing regulations. The statute declares, "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a) (2012). The implementing regulation, known as Regulation S-P, prohibits the disclosure of so-called "nonpublic personal information" to third parties without consent. 17 C.F.R. § 248.10 (2017). Nonpublic personal information is defined to include customer lists from financial institutions, even if those lists contain only names of Fidelity customers because the identity of an individual as being a customer of a particular financial institution is specifically protected by the federal regulations. 17 C.F.R. § 248.3(t)(1)

(2017); 17 C.F.R. § 248.3(u)(2)(i)(D) (2017).  Indeed, these regulations also protect a customer's account information.  17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u)(1).

53.     Fidelity customers rightfully have an expectation that their confidential contact and financial information, such as their net worth, risk tolerances, investment goals, and preferences, will be protected and not misused by departing employees. Thus, customers understandably are concerned when former Fidelity employees and their new employers, such as the Defendants, have access to their information and are using it to solicit their business at a new and different brokerage institution.

54.     In other words, the damage to Fidelity's customer relationships has already occurred, is ongoing and is incalculable, as Fidelity cannot put a price on the value of its customer relationships or the damage caused when the Defendants took and improperly misused confidential and trade secret customer information to solicit and divert customers.

55.     Based on all the foregoing facts and conduct, Fidelity believes and thereon alleges that the Defendants prepared to engage in, are engaging in, and plan to continue to engage in the following wrongful acts:

- use and/or disclosure of Fidelity's trade secret customer information and misappropriation of the trade secret information contained in confidential Fidelity business records, including specifically the names, addresses, phone numbers, and/or other confidential financial information of Fidelity customers;

- transmission verbally, in writing or in another manner for the use of a Fidelity competitor, customers' contact and financial information contained in Fidelity's records; and

- solicitation of Fidelity customers to transfer their assets.

56.     Fidelity has been and continues to be damaged, both monetarily and irreparably, by the actual and threatened loss of customers and customer goodwill caused by the Defendants' misappropriation and misuse of Fidelity's trade secret

customer information and solicitation of Fidelity's customers in violation of the California and federal law, as well as York's Employee Agreements.

57.    Denial of injunctive relief would also leave Fidelity vulnerable to the same conduct from other employees.

58.    Fidelity asks for the Court's assistance in protecting that information and stopping the Defendants' knowing and intentional wrongful conduct.

## FIRST CAUSE OF ACTION
### (Injunctive Relief)

59.    The allegations of Paragraphs 1 through 58 are incorporated herein by reference with the same force and effect as if set forth in full below.

60.    In doing the acts described herein, the Defendants have harmed Fidelity by, among other things, improperly garnering, retaining, disclosing and utilizing Fidelity's confidential and proprietary information and trade secrets, in violation of California and federal law, attempting to poach Fidelity's customer accounts, and diminishing Fidelity's reputation and goodwill.

61.    Unless the Defendants are temporarily and preliminarily enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

        (a)    Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;

        (b)    Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

        (c)    Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

        (d)    Potential future economic loss, which is presently incalculable.

62.    Thus, Fidelity is entitled to temporary and preliminary injunctive relief.

## SECOND CAUSE OF ACTION

### (Misappropriation of Trade Secrets Under the California Uniform Trade Secrets Act)

63.     The allegations of Paragraphs 1 through 58 are incorporated herein by reference with the same force and effect as if set forth in full below.

64.     Fidelity developed and owns trade secrets as defined by the California Uniform Trade Secrets Act ("CUTSA"), California Civil Code §§ 3426-3426.11.

65.     Fidelity's above-described confidential information, including its confidential customers contact information and identities, financial and account information (including customer names, addresses and phone numbers) are trade secrets of Fidelity subject to protection under the CUTSA.

66.     Fidelity derives a significant economic and competitive advantage in the financial services industry from maintaining the secrecy and confidentiality of its trade secret customer information.

67.     Fidelity's trade secret customer information, including the names, contact information, and asset levels of Fidelity customers, is developed through Fidelity's substantial investment of time, money, and effort and is subject to reasonable efforts by Fidelity and its employees to maintain its secrecy and/or confidentiality.  As described in greater detail above, Fidelity maintains its trade secret customer information on password-protected computers, limits access to the information, mandates that employees follow its Confidentiality Policy, and requires employees to sign Employee Agreements.

68.     Additionally, the names, addresses and contact information of Fidelity customers are protected from disclosure as personally identifiable information under the Gramm-Leach Bliley Act and its implementing federal regulations, commonly referred to as Regulation S-P.  See 17 C.F.R. Part 248.  Even the fact that an individual is a customer of a specific financial institution – here, Fidelity – is protected from disclosure under Regulation S-P.  17 C.F.R. § 248.3.  These federal regulations

underscore the confidential nature of financial services customer information.

69.     The Defendants have improperly used and continue to use Fidelity trade secret customer information for the unauthorized and unlawful purpose of soliciting customers to transfer their business to York at Cypress.

70.     The Defendants' conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets.

71.     Because Defendants' unlawful conduct is ongoing, Fidelity faces an immediate threat of continuing irreparable harm, for which Fidelity lacks an adequate remedy at law.

72.     Unless Defendants are enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

>    (a)     Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;

>    (b)     Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

>    (c)     Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

>    (d)     Potential future economic loss, which is presently incalculable.

### **THIRD CAUSE OF ACTION**

**(Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act – 18 U.S.C. § 1831 *et seq.*)**

73.     The allegations of Paragraphs 1 through 58 are incorporated herein by reference with the same force and effect as if set forth in full below.

74. The above-alleged facts constitute actual and threatened misappropriation of trade secrets by the Defendants pursuant to the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 et seq., in one or more of the following respects.

75. Fidelity's above-described trade secrets, including the contact and confidential financial and account information of Fidelity customers, are subject to reasonable efforts by Fidelity to maintain their secrecy and/or confidentiality. Fidelity's customer information is not generally known.

76. The Defendants have used Fidelity's customer information without Fidelity's consent. The Defendants engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty York owed and continues to owe Fidelity as a former agent, employee and representative of Fidelity.

77. Such information is also protected as "non-public" information under federal securities Regulation S-P. 17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u). Accordingly, Fidelity is required by federal statute to ensure that non-public customer contact, financial, and account information such as that misappropriated by the Defendants is not disclosed to third parties without consent. 17 C.F.R. § 248.10.

78. Fidelity derives a significant economic benefit from the above-described trade secrets.

79. Fidelity faces an immediate threat of continuing irreparable harm, for which Fidelity lacks an adequate remedy at law, from the Defendants' ongoing misappropriation and misuse of Fidelity's trade secret customer information.

80. Unless the Defendants are temporarily and preliminarily enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

    (a)    Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;

    (b)    Use of Fidelity's trade secrets to solicit customers on behalf of a

competitor;

    (c)    Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

    (d)    Potential future economic loss, which is presently incalculable.

81.    The Defendants' conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets.

82.    Thus, Fidelity is entitled to temporary and preliminary injunctive relief, restitution, compensatory and exemplary damages, and reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION
### (Breach of Contract)

83.    The allegations of Paragraphs 1 through 58 are incorporated herein by reference with the same force and effect as if set forth in full below.

84.    York's Employee Agreements are valid contracts supported by adequate consideration.

85.    In the Employee Agreements, York acknowledged that as a consequence of her employment with Fidelity, she would be given access to confidential information about Fidelity's clients.  See <u>Exhibits A-B</u> to the Jennings Affidavit.  As described above, this information was provided to York not only at the outset of her employment, but she was also provided with continuing access to an evolving and nearly continually updated pool of information about the Fidelity clients that she was assigned to service, all of which was essential to her ability to perform her job duties.

86.    Pursuant to the terms of her Employee Agreements, York agreed to keep Fidelity's records, including particularly Fidelity's customer lists and customer information, confidential. *Id.*

87.     York promised to use Fidelity's customer information only in the course of her employment with Fidelity, and promised not to divulge Fidelity's customer information to third parties. *Id.*

88.     York violated the confidentiality and non-disclosure provisions of her Employee Agreements by using Fidelity's confidential customer information on behalf of herself, including by using that information to solicit Fidelity clients to follow her to Cypress.

89.     York also promised to return any of Fidelity's customer information in her possession to Fidelity upon termination of her employment. *Id.*

90.     York sought to circumvent and in fact breached this provision of her Employee Agreements by, on information and belief, either taking the trade secret and confidential information, or creating or recreating the trade secret and confidential information from memory for competitive use at her new firm.

91.     York also promised that she would not solicit Fidelity customers for a period of one year after her termination. *Id.*

92.     York breached the non-solicitation provision of her Employee Agreements by using her knowledge of Fidelity's customer information to solicit Fidelity customers to transfer their business to her at Cypress.

93.     York continues to violate her contractual obligations, and will continue to violate these obligations in the future.

94.     As a consequence of the foregoing, Fidelity has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as present economic loss and other incalculable financial loss.

95.     In her Employee Agreement, York expressly agreed that "violation of this Agreement will cause irreparable damage" to Fidelity. *Id.*

96.     Unless York is enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

        (a)     Disclosure of trade secrets, customer lists, and other trade secret

confidential information that is solely the property of Fidelity and its customers;

(b)    Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

(c)    Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

(d)    Potential future economic loss, which is presently incalculable.

## FIFTH CAUSE OF ACTION
### (Unfair Competition)

97.    The allegations of Paragraphs 1 through 58 are incorporated herein by reference with the same force and effect as if set forth in full below.

98.    The Defendants' conduct constitutes an unfair method of competition under California law.  The Defendants actively participated in, and induced others to carry out all of the acts of unfair competition outlined above.  Moreover, the Defendants' acts of unfair competition are willful and intentional.

99.    As a direct and proximate result of the acts and course of conduct of the Defendants described above, Fidelity has suffered and will continue to suffer irreparable harm and loss.

100.    Unless this Court enjoins them from doing so, the Defendants will continue their unlawful acts of unfair competition, causing Fidelity immediate, irreparable damage for which it has no adequate remedy at law.

101.    Therefore, Fidelity is entitled to temporary and preliminary injunctive relief enjoining the Defendants from any further acts of unfair competition.

## SIXTH CAUSE OF ACTION
### (Tortious Interference with Existing Business Relations)

102.    The allegations of Paragraphs 1 through 58 are incorporated herein by reference with the same force and effect as if set forth in full below.

103.   The Defendants tortiously interfered with Fidelity's client relationships by planning to and in fact soliciting clients to move their accounts to Defendants, including through the use of Fidelity's confidential information and trade secrets.

104.   Cypress further tortiously interfered with Fidelity's contractual relationship with York by, upon information and belief, inducing and aiding York to breach her contractual obligations to Fidelity.

105.   Cypress knew of Fidelity's employment agreement with York, or should reasonably have known of the existence of that agreement.

106.   As a direct and proximate result of the Defendants' conduct, Fidelity has suffered and will continue to suffer financial loss, loss of goodwill, an irreparable loss of the confidentiality of client information, as well as the loss of proprietary firm information and trade secrets.

107.   Fidelity is entitled to a temporary and preliminary injunctive relief enjoining the Defendants from further acts of tortious interference.

## SEVENTH CAUSE OF ACTION

### (Unjust Enrichment)

108.   The allegations of Paragraphs 1 through 58 are incorporated herein by reference with the same force and effect as if set forth in full below.

109.   The Defendants have misappropriated Fidelity's trade secrets and confidential information, York has breached her Employee Agreements, Cypress has induced that breach, and both Defendants have unfairly competed with Fidelity thereby wrongfully benefitting from their actions.

110.   As a result of the Defendants' wrongful and illegal conduct, they have benefitted in the form of Fidelity customer accounts that have transferred to York at Cypress.  Also as a result of the Defendants' wrongful and illegal conduct, Fidelity has suffered harm.

111.   Allowing the Defendants to benefit from such conduct would be unfair and should be prohibited.

## **PRAYER FOR RELIEF**

For the reasons set forth above, Fidelity respectfully requests that the Court enter a Temporary Restraining Order and Preliminary Injunction, pending arbitration before FINRA or until further order of the Court:

1. Enjoining the Defendants and anyone acting in concert with them, including any agent, officer, employee, or representative of Cypress, effective immediately, from using Fidelity's trade secret customer information to solicit or induce, whether directly or indirectly, and whether alone or in concert with others, any business from any Fidelity customer whom Defendant York served or whose name she learned of through her employment with Fidelity;

2. Enjoining the Defendants and anyone acting in concert with them, including any agent, officer, employee, or representative of Cypress, effective immediately, from using, disclosing, transmitting or continuing to possess for any purpose, the information contained in the records of Fidelity regarding those Fidelity customers whom Defendant York served or whose names became known to her while in the employ of Fidelity, including, but not limited to, the names, addresses, telephone numbers, email addresses, and confidential financial information of those customers;

3. Ordering the Defendants, and anyone acting in concert with them, to return to Fidelity any and all records, information and/or documents in any form, received or removed from Fidelity by York containing information pertaining to customers or prospective customers of Fidelity whom she served or whose name became known to her while in the employ of Fidelity, within five (5) days from the entry of this Court's Order, including any and all copies. This requirement includes all records, information or documents, in any form, created by York, or anyone acting

1  in concert with her, based on documents or information that was received
2  or removed from Fidelity by York, and specifically includes any list of
3  Fidelity customer names that may have been created or recreated by York
4  from memory, or derived from a list created or recreated by York from
5  memory;

6  4.  Directing that Fidelity and York, pursuant to the Federal Arbitration Act,
7  9 U.S.C. §§3-4, shall proceed toward an expedited arbitration hearing on
8  the merits before a duly appointed panel of arbitrators pursuant to Rule
9  13804 of the FINRA Code of Arbitration Procedure.

Dated:  October 8, 2019                    FISHER & PHILLIPS LLP


                                    By:  /s/ Sarina Saluja
                                         SARINA SALUJA
                                         Attorneys for Plaintiff
                                         Plaintiff Fidelity Brokerage Services LLC